U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 3, 2014**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FRIENDSHIP DAIRIES, A GENERAL | § | Case No. 12-20405-RLJ-11 |
| PARTNERSHIP, | § | |
| | § | |
| Debtor. | § | |

## <u>MEMORANDUM OPINION</u>

Hearing on confirmation of the chapter 11 plan of the debtor, Friendship Dairies (sometimes "Debtor"), was held on September 10 and 11, 2013, and October 9, 2013.

Friendship Dairies seeks confirmation of the Second Amended Plan of Reorganization [Docket No. 463] ("Second Amended Plan"), filed on July 2, 2013, as modified by the First Modification to Second Amended Plan [Docket No. 652] ("First Modification"), filed on September 11, 2013. The sole objecting creditor, AgStar Financial Services, FLCA, as loan servicer and attorney-in-fact for McFinney Agri-Finance, LLC ("AgStar"), not only objects to *any* plan proposed by

Friendship Dairies, it also objects to the Court's consideration of the First Modification. For purposes of this memorandum opinion, the Second Amended Plan, as modified by the First Modification, will be referred to as the "**Plan**."

Upon careful consideration of the evidence presented and arguments of counsel, the Court concludes that confirmation must be denied.

The Court has jurisdiction over the issues raised here pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.

## A.

The Plan reflects a reorganization proposal by which Friendship Dairies continues its dairy operations, albeit in a modernized, more efficient manner, as a means to potentially pay its creditors in full over a period of several years and at rates that accord its creditors the present value of their respective claims. As discussed in greater detail below, unsecured creditors may, in lieu of a payout, elect to receive a much-reduced immediate payment. The Plan has eighteen classes of creditors and one class for the partners; the partners, Class 17, simply retain their partnership interests. Classes 1, 2, and 3 address the administrative, priority non-tax, and priority tax claim creditors, respectively. Classes 4 through 12 are asserted secured creditors. Classes 13 and 14 are special classes established for the treatment of the unsecured claim of Frontier Capital Group, Ltd. ("Frontier") (Class 13) and the unsecured claims of affiliated persons, i.e., the partners Jakob Van DerWeg, Patrick VanAdrichem, and his wife Linda VanAdrichem (Class 14). Class 15 constitutes the general unsecured creditor class. Class 16 covers penalty claims.

Finally, Class 17 addresses equity claims, with Classes 18 and 19 covering claims of co-obligors and subrogation claims.

Friendship Dairies commits to paying administrative claims upon the effective date of the Plan which is, generally, the first day of the month following thirty days after confirmation of the Plan. It anticipates that administrative claims will be approximately $425,000, consisting of reclamation claims under § 503(b)(9), certain cure claims, and professional fee claims. The Debtor will also pay 2013 ad valorem taxes and U.S. Trustee fees. The claim of the Internal Revenue Service ("IRS") of $218,844.65 is the only priority claim of significance; the Plan provides that the IRS will be paid over 45 months at 3% interest, resulting in payments of $5,147.97 per month, beginning on the effective date.

The Class 4 claimant, Deaf Smith County Appraisal District, holds a claim of $114,872.24 and will be paid over 60 months at 12% interest. The payments are $2,555.27 per month. John Deere Financial, the Class 5 secured creditor, holds three claims in the total amount of $180,225.33 and will be paid, on its three claims, the monthly sums of $471.07, $2,226.77, and $4,366.61, respectively. They are paid in accordance with the existing contracts between the parties. The interest rates on such claims range from 3.99% to 7.25% and will be paid out in approximately three years.

The secured claim of Volvo Financial Services, Class 6, is paid out over seven months with payments of $11,613 per month, which payments satisfy a balloon payment obligation of $79,438.74 that came due in March 2013.

The Plan reflects agreements that Friendship Dairies reached with Lone Star Milk Producers ("Lone Star"), Frontier, Gavilon Ingredients, LLC ("Gavilon"), and Dimmitt Flaking, LP ("Dimmitt Flaking"), Classes 7, 8, 9, and 10 under the Plan. The agreements significantly altered the respective rights of such parties and were made, at least in part, to facilitate the

Debtor's prospects in its reorganization effort.  Lone Star's claim is treated as a secured claim for $400,000, secured by the Debtor's equity credits with Lone Star.  Lone Star's claim is in the nature of an offset claim.  It is paid through a $0.10 per hundredweight deduction on all milk proceeds payable to Friendship Dairies by Lone Star and by retention of 35% of the Debtor's annual patronage dividend.  The claim bears interest at 5.5% per annum.

Frontier has a total claim of $27,041,479.91, which, by agreement between Friendship Dairies and Frontier, is bifurcated into a secured claim for $16,700,000 and an unsecured deficiency claim of $11,041,479.91.  (The additional $700,000 on its secured claim arises from Frontier's purchase of AgStar's lien position on milk and milk proceeds.  *See* Interim Order Authorizing Use of Cash Collateral, Docket No. 542.)  Frontier's secured claim is split into two notes, a large note of $16 million and a smaller note of $700,000.  The large note provides for monthly payments over 60 months, with interest rates that adjust up on twelve-month intervals (from 3.25% to 4.25% to 5.5%) and thus increasing the monthly installments, ranging from $95,000 per month for months 1–12, $115,000 per month for months 13–24, and $135,000 per month for months 25–59.  A final balloon payment is due on the 60th month.  The amount of the balloon payment is not set forth in the Plan.  Upon each one-year anniversary date of the note, Friendship Dairies is obligated to pre-pay principal of the note if it has "excess cash flows" as such phrase is defined under the Plan.  The smaller obligation, the $700,000 note, is likewise paid over 59 months; the interest rate on such note is 5% per annum, with payments of $5,848.05 per month.  It, too, contains a balloon payment on the 60th month.

Of significance is Frontier's settled-out deficiency claim of $11,041,479.91.  Frontier's lien rights extended to essentially all of Friendship Dairies' personal property assets—livestock, equipment, inventory, receivables, etc.—but it allowed its financing statement to lapse immediately before Friendship Dairies filed this chapter 11 proceeding.  (It also apparently holds

a deed of trust lien against a few tracts of real property.) Friendship Dairies thus had negotiating leverage which was in part countered by the amount of Frontier's claim relative to other creditors and the aggregate value of the estate's assets. In return for treating Frontier's claim as secured to the extent of $16,700,000, Frontier agreed that its unsecured deficiency claim of over $11 million would not share in distributions to other unsecured creditors. Frontier's unsecured deficiency claim, for which no distributions are made, is designated as Class 13 under the Plan.

The treatments of Gavilon and Dimmitt Flaking under the Plan are also based on agreements reached by such creditors and Friendship Dairies. Gavilon and Dimmitt Flaking filed proofs of claim reflecting that they held secured claims, Gavilon for $270,457.32 and Dimmitt Flaking for $514,240.80. The Plan provides that the security interests of both are, however, potentially avoidable as preferences under § 547 of the Bankruptcy Code. By the agreements reached, the claims of both creditors are allowed as unsecured claims in the amounts stated, and the agreement further provides that "all *payments* made" to each by Friendship Dairies within the 90 days preceding the bankruptcy filing are deemed unavoidable. First Modification, ¶¶ 6 and 7 (emphasis added). Whether the potentially avoidable *liens* are the same as the potentially avoidable *payments* is unclear.

The secured claim in the amount of $358,650 of the Underwood Law Firm, the Class 11 creditor, will be paid in full over 120 months with interest at 3% per annum. The estimated monthly payment is $3,463.15.

As stated above, AgStar is the Class 12 creditor under the Plan; AgStar is the largest secured creditor in the case, as well. The Plan provides that the Court will determine the *amount* of AgStar's claim upon hearing on the Debtor's objection to AgStar's claim. AgStar's proof of claim reflects a principal balance, as of the petition date, of $16,408,373.40. AgStar has received payments during the pendency of this bankruptcy case of $1,071,323, which, Friendship Dairies

contends, is properly credited against AgStar's principal balance. The Plan treats AgStar as oversecured and thus recognizes that it accrues interest and attorneys' fees from the petition date. AgStar's lien on the dairy facility, consisting of the real estate and improvements, is not disputed. The parties do dispute the extent to which AgStar is oversecured. Regardless, the Plan purports to pay AgStar the full amount of its allowed secured claim with monthly installment payments that are based upon a twenty-year amortization, with a balloon payment due October 1, 2028, fifteen years from the effective date of confirmation. The Plan provides that AgStar will be issued a new promissory note; the initial interest rate will be 5.0% per annum with adjustments to the rate made on September 1, 2015 and September 1, 2022, respectively. The adjusted rates will be based on a formula of 4% above the inflation indexed rate for 7-year Treasury securities. The Plan recognizes, however, as an alternative to the initial 5% rate, that the Court may ultimately determine an initial rate that accords with the Supreme Court's opinion in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), and the Fifth Circuit's opinion in *Matter of Texas Grand Prairie Hotel Realty, LLC*, 710 F.3d 324 (5th Cir. 2013). The Plan estimates that its proposed treatment results in monthly payments to AgStar that exceed $106,000. Finally, the Plan's treatment of AgStar contemplates that AgStar's post-petition interest rate will be the non-default rate of 6.3%, unless the Court determines otherwise, and that the so-called "prepayment fee" under the existing loan instruments is disallowed (assuming it applies). The Plan preserves a prepayment fee going forward, however.

Class 14 addresses the claims of affiliated parties, which are the partners Jakob Van DerWeg, Patrick VanAdrichem, and his wife Linda VanAdrichem. The Plan proposes to pay such claims but not until all general unsecured creditors have been paid.

General unsecured creditors, Class 15 under the Plan, are estimated to be in the total amount of $3,294,334.51 (including Gavilon's claim of $270,457.32 and Dimmitt Flaking's

claim of $514,240.80). Unsecured creditors are given the option of being paid an immediate 30% dividend (30% of their allowed claim) by Frontier's purchase of the claim, or payment in full with interest at 3% per annum in monthly installments over 180 months. With respect to Frontier's purchase of claims under the purchase option, Frontier will share in distributions to other creditors that elect such option, but its purchased claims will be deemed satisfied upon the Debtor's payment of 60% of the purchased claim. The estimated monthly payments to unsecured creditors are $24,692.43.

### B.

Classes 4 (Deaf Smith County Appraisal District), 7 (Lone Star Milk Producers), 11 (Underwood Law Firm), 14 (General Unsecured Claims of Affiliated Entities), 15 (General Unsecured Claims), 18 (Co-Obligor Claims), and 19 (Subrogation Claims), each of which is an impaired class, voted to accept the Plan. No votes were cast by impaired Classes 3, 6, 8, 9, 10, 13, and 16. AgStar, Class 12, cast its vote rejecting the Plan.

### C.

Friendship Dairies' reorganization reflects a conceptual change to its operations. It disbands heifer raising as part of its operations and, instead, implements a more intensive milking operation with more milking cows. This entails selling off existing young stock, which generates needed capital for additional milking cows. Friendship Dairies anticipates that its milking herd will increase from approximately 5,800 milking cows to approximately 7,500 milking cows. According to its expert, Dr. Raymond Hunter, it should reach an inventory of 7,500 milking cows by spring 2014. This is the most stable, best, and most efficient use of the dairy facilities, according to Dr. Hunter. Friendship Dairies proposes to continue a farming component that produces forage for feed that can be used as a hedge against volatile feed prices in the future.

Friendship Dairies' new concept—moving to a more intensive milking, complementary farming operation—began during the latter stages of this chapter 11 proceeding. Given the extreme volatility of the dairy industry, as well as the particular problems experienced by Friendship Dairies, it is difficult to predict when Friendship Dairies would realize the benefits of this transition.

During the pendency of this chapter 11 case, Friendship Dairies has implemented systems that would improve its operations over time. It is now using a feeding system and a fertility monitoring program. The feeding system, referred to as "Easy Feed," monitors at all times its inventory and quality of feed. Through a G.P.S.-based program, Friendship Dairies knows at all times its silage inventory from crops raised in its farming operations. The fertility monitoring program keeps constant track of pregnancy rates of the cows and thus brings greater transparency to and knowledge of the dairy's herd and overall condition of the herd. With these systems in place, Friendship Dairies submits that it is in a better position to implement its reorganization.

The cows and the herd in general have been well cared-for and managed; the milking cows have, historically, been decently productive.

During this case, Friendship Dairies has installed two water wells that have allowed it to irrigate its farm and thus significantly improve the yield of its forage crop. The current forage crop is much better than its prior years'; the production is greater and should generate substantial forage feed through spring 2014. Friendship Dairies proposes to install a third well to further enhance the production of its farm. The increased forage as feed potentially reduces overall feed costs.

Friendship Dairies has experienced much litigation during these bankruptcy proceedings, virtually all of which centers around its relationship with AgStar. AgStar seeks liquidation and has not indicated any willingness to entertain a "plan" that contemplates an ongoing relationship

with AgStar.

Dr. Hunter performed an analysis of Friendship Dairies' operations going forward. His projections do not factor-in required payments to creditors as provided for under the Plan, however. Dr. Hunter's cash flow analysis anticipates available cash to use for Plan payments and to fund reserve accounts for future contingencies. The report reflects positive cash flow, net of costs of operations, for three years by quarter, with each year running from May through April. For the year ending April 2014, the projected available cash is $2.789 million (this sum is net of the payment to AgStar of $396,000 that was not made in the ordinary course); for the year ending April 2015, the projected available cash is $3.998 million; for the year ending April 2016, the projected available cash is $4.227 million. *See* Debtor's Exhibit 4. Dr. Hunter, by his testimony, supplemented his written report to slightly alter his projections. As so altered, the estimated available cash increases slightly (within a range of $15,000 to $26,000 each quarter).

Friendship Dairies failed to meet its own projections during the pendency of the bankruptcy case. And, as of the confirmation hearing, it had failed to pay two required adequate protection payments of $83,000 each to Frontier; it also did not have a reserve account, much less one with $500,000, as contemplated by Dr. Hunter's cash flow projections.

It appears that stated reserves were used to fund a pre-confirmation shortfall that resulted from operations; the reserve account under the Plan going forward is $500,000. For the first quarter ending July 2013, the cash reserve was $1.437 million; the cash flow analysis for such quarter reflects a shortfall of $607,000. *See* Debtor's Exhibit 4.

In accordance with § 506(b) of the Bankruptcy Code, the Plan provides that oversecured creditors may add reasonable and necessary attorneys' fees to their claims as long as such fees do not exceed the excess collateral value. By the terms of the Plan, the allowed fees are paid without interest by extended installment payments that *begin after* the underlying secured claim

has been paid. Accordingly, as to AgStar, assuming attorneys' fees are determined to be reasonable and necessary, its fees are proposed to be paid in installments beginning at the end of the installment period, which occurs with a balloon payment due October 1, 2028.

The Plan includes settlements between Friendship Dairies and certain unsecured creditors of potential preference claims. The settlements incorporate significant reductions in the claim amounts asserted by such creditors as a way to effect the various settlements. For example, the Plan states that ADM (Archer Daniels Midland) has a filed or scheduled claim of $49,850.45 but was recipient of potential preference payments of $78,326.11. ADM agreed to an allowed unsecured claim of $10,687.39, which represents, in effect, a 50% recovery to the bankruptcy estate on the preference claim. Similar settlements were reached with creditors Commodity Specialists Company (with a 90% recovery to the estate on the potential preference claim), DBS Commodities, GEA Farm Technologies (100% recovery), and Link Feed Ingredients.

According to Frontier, it is owed $30,324,662.56, which sum includes the "Milk Lien" purchase of AgStar's lien position on milk proceeds. *See* Frontier's Exhibit 2. This purchase was approved by the Court's order of July 30, 2013 [Docket No. 542]. Frontier submits that the aggregate value of the collateral securing its claim, assuming validity of its liens, is $17,695,014. *See* Frontier's Exhibit 3. As stated, its claim, as restructured and agreed upon under the Plan, is $27,741,479.91, of which $11,041,479.91 is unsecured and will not share in distributions under the Plan.

David Schaeffer, manager and treasurer of Frontier, testified that so long as Friendship Dairies is current on its payments at the time the balloon payment comes due (in the 60th month), Frontier would likely renew and refinance the obligation. He said that Frontier had never forced a balloon payment upon a performing borrower. Schaeffer also testified that he considered Frontier's collateral would bring a little more than $10 million in a liquidation sale.

Schaeffer testified that he was of the opinion that Friendship Dairies' Plan will work, which, in part, justified Frontier's purchase of AgStar's milk lien for $700,000 and its agreement to purchase claims of unsecured creditors.

Friendship Dairies and Frontier anticipate that approximately $2.7 million of the $3.2 million in unsecured creditors will select the 30% pay-out option set forth at Option 15A of Class 15. This means Frontier would pay approximately $810,000 for such claims. Of this sum, Friendship Dairies is obligated to pay 60%, or $486,000, to Frontier as holder of the claims.

According to AgStar's expert, James Synatzske, the dairy facilities that make up AgStar's collateral—the real estate (consisting of approximately 5,021.55 acres on four non-contiguous parcels of land, with two commercial dairy facilities on one of the sites) and improvements (including barn milking equipment, pivot sprinkler systems, and irrigation motors and gear heads)—have a market value of $17.9 million and a liquidation value of $15.2 million. *See* AgStar's Ex. 12. By the Plan, the Debtor treats AgStar as fully secured, at least to the extent of having collateral of a value that would cover AgStar's interest (at a non-default rate) and allowable attorneys' fees.

Though AgStar's claim amount is subject to determination upon the Debtor's objection, AgStar's claim will fall within a range of $16 million to $18.5 million. Mr. Synatzske's appraisal skews the collateral value down by approximately $3 million because of "excess depreciation," a concept of his invention and one not used or commonly accepted in the appraisal industry. Regardless, given the continued accrual of interest and ongoing depreciation of the dairy facilities, the equity in AgStar's collateral, if any, is rapidly declining.

## II.

## A.

AgStar contends that Friendship Dairies cannot make the payments called for under the Plan and thus the Plan fails to satisfy the feasibility requirement of § 1129(a)(11). AgStar requests that Friendship Dairies be directed to surrender its collateral to AgStar or, alternatively, that the stay be lifted as requested by its pending motion seeking stay relief [Docket No. 441]. AgStar also objects to specific provisions regarding treatment of its claim under the Plan. It submits that the 5% interest rate is too low in light of Friendship Dairies' circumstance and the risk associated with the credit as restructured. AgStar objects to the Plan's provisions providing that AgStar's attorneys' fees are not paid until fifteen years and without interest. AgStar opposes Friendship Dairies' proposal that the restructured debt be evidenced by a new note and security instruments which, AgStar says, "omit necessary and customary covenants for dairy facility loans." On this point, the Court notes that AgStar's objection also states as follows:

> The Plan provides that Debtor shall be required to comply with all of the non-monetary covenants of the Deeds of Trust (i.e. insurance requirements, real estate tax payment requirements, repair and maintenance requirements and financial reporting requirements). The Plan should provide that any nonmonetary default thereunder shall constitute a default under the Plan authorizing AgStar to enforce its lien rights without further order of the court.

AgStar's Objection [Docket No. 540] ¶ 29.

AgStar submits that the Plan fails to accord it the present value of its claim. This point is raised separately from its complaint that the interest rate is too low. The basis for this allegation is therefore unclear.[1] AgStar argues that Friendship Dairies has no real intention of performing

---

[1] The objection is raised at paragraph 36 in which it states as follows: "[w]ith respect to AgStar's secured claim, AgStar has not accepted the Plan, and the Plan does not provide that AgStar shall retain its lien securing its claim and the value, as of the effective date of the Plan, of the property to be distributed by the Debtor under the plan on account of AgStar's claim is not less than the allowed amount of such claim. Further, the Debtor has not surrendered AgStar's collateral to AgStar." It is certainly true that AgStar has not accepted the Plan and that Friendship Dairies is not surrendering AgStar's collateral to AgStar. The Court assumes that AgStar is simply

under the Plan and thus the Plan is not proposed in good faith. The Plan, according to AgStar, is nothing more than a ruse to "inoculate" a "certain subclass of unsecured creditors from avoidance claims." *Id.* ¶ 38(b). AgStar complains of many other things: that Frontier has received approximately $1 million of voidable adequate protection payments and will be allowed to "scoop up" a lien on all the Debtor's assets except the real estate and milk and milk proceeds; that, in addition, Frontier will be paid $16 million, or 175% of what it would be paid upon liquidation; that management is inadequate and incompetent; and that the Plan does not require title insurance on AgStar's deed of trust lien.

AgStar's view of the Plan is best summed-up at paragraphs 39 and 40 of its Objection:

> The Short Term Plan meets the objectives of certain creditors who are active in this case. However, the Short Term Plan is unconfirmable because the Debtor will not be able to (and in fact has no intention to) complete all payments due under the Plan once the short term objectives of certain professionals and creditors are met under the Short Term Plan.

> To be fair, no voidability inoculation should be given to any creditor and no final order approving attorneys' fees for professionals of the estate should be entered until after the Debtor has timely made at least three years of payments under the plan and has performed all of its material obligations under the plan.

*Id.* ¶¶ 39 and 40.

Finally, AgStar submits, without elaboration, that the Plan is not in the best interest of creditors, especially AgStar, and that it fails to satisfy the absolute priority rule.

## B.

A bankruptcy court must approve confirmation of a plan that meets the requirements of § 1129(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a). Alternatively, if the requirement of acceptance by all impaired classes—§ 1129(a)(8)—is not met, confirmation can still be achieved if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of

---

making the point that the treatment of AgStar under the Plan does not *both* provide for retention of its lien *and* payments that satisfy the present value of its claim.

claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b). The fair and equitable standard as it concerns a class of secured claims is satisfied by a plan that proposes that the secured creditors retain their liens and are paid deferred cash payments that will meet the present value of the claims. *See* 11 U.S.C. § 1129(b)(2)(A).

The first order of business here is to define "the plan" that is under consideration. AgStar objects to the Court's consideration of the First Modification. The Court rejects AgStar's objection. Section 1127(a) of the Code allows a plan proponent, the Debtor here, to modify its plan at any time before confirmation. *See* 11 U.S.C. § 1127(a). In addition, "[a]fter the proponent of a plan files a modification of such plan with the court, the plan as modified becomes *the plan*." *See* 11 U.S.C. § 1127(a) (emphasis added). The statute rebuts AgStar's main argument that the First Modification is not the plan that is before the Court for confirmation. The First Modification was obviously filed before confirmation. AgStar's real argument, however, is that it was not provided sufficient notice of the First Modification. The First Modification was filed on September 10, 2013; the confirmation hearing, as set forth above, was held on September 10 and 11, 2013, and October 9, 2013. As is common with chapter 11 proceedings, the First Modification mostly reflects last minute agreements reached between the Debtor and certain of its creditors. In particular, the First Modification sets forth the agreements reached by the Debtor with Frontier, Lone Star Milk Producers, Gavilon, Dimmitt Flaking, and several other creditors who were identified as transferees of potential preference payments. Such parties obviously have no objection to the changes made by the First Modification. The First Modification also altered the treatment of AgStar's claim. In this respect, it simply provides that AgStar's claim amount will be determined by the Court upon hearing on the Debtor's objection to AgStar's claim [Docket No. 481]. It provides for a prepayment fee that is similar to the prepayment fee under the existing loan documents. The interest rate from the filing date to the

effective date of the Plan is set at 6.3% per annum, the non-default rate; the rate under the restructured credit is set initially at 5%, subject to the Court's resetting in accordance with the Supreme Court's opinion in *Till v. SCS Credit Corp.* and the Fifth Circuit's opinion in *Matter of Texas Grand Prairie Hotel Realty, LLC*. Finally, the First Modification provides for a formulaic resetting of the interest rate on September 1, 2015, and on September 1, 2022. The changes were made principally to conform the treatment with the existing terms between the parties. The First Modification enhances and clarifies the treatment of AgStar's claim. The basic provisions and concept of the Plan were not changed by the First Modification. AgStar had notice of the changes at the beginning of the confirmation hearing and thus several weeks prior to the final hearing date on October 9, 2013. It could have plotted out any argument or evidence it might proffer in opposition to such changes. The First Modification did not prejudice AgStar. The Court therefore considers "the plan" as the Second Amended Plan as modified by the First Modification.

## C.

The Plan and AgStar's objections raise several issues, some basic, some technical. AgStar's objections are not without some tilting at windmills—Debtor's bad faith and specific intention *not* to pay creditors; the professionals' and creditors' conspiracy, as accommodated by the Debtor, to "inoculate" themselves.[2] The meaningful issue here is feasibility. The creditors as a whole want to give Friendship Dairies the benefit of the doubt and thus the opportunity to make its Plan work. Creditors fare better if the Plan is confirmed and Friendship Dairies performs accordingly. For example, as AgStar pointed out, Frontier receives $16 million on its $30 million claim if the Plan works, but receives $10 million, at best, if it does not work. Why

---

[2] AgStar's representative, Dan Godfrey, who is also an attorney knowledgeable about bankruptcy, candidly testified that the Debtor and its other creditors were proceeding in good faith.

this is bad, as AgStar suggests, is beyond the ken of this Court. AgStar is a fully secured, stand-alone secured creditor in the case. The issues apart from feasibility that legitimately concern AgStar are not those that relate to Friendship Dairies' proposed treatment of other creditors and classes; instead, they are the issues that concern whether, as to AgStar, the proposed interest rate is fair, whether the payment of attorneys' fees without interest is fair, and whether the implementation of the Plan-terms with new notes and security instruments is fair. These issues fall under the ambit of the § 1129(b) fair and equitable requirement. The Court must, however, first assess the § 1129(a) requirements and, particularly, the feasibility requirement under § 1129(a)(11).[3]

The Court's overarching goal in assessing a plan's feasibility is to determine whether the debtor has shown, by a preponderance of the evidence, "the existence of a reasonable possibility that a successful rehabilitation . . . can be accomplished within a reasonable period of time." *See, e.g., In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 110 (Bankr. W.D. Tex. 1987) (quoting *In re Playa Development Corp.*, 68 B.R. 549, 555 (Bankr. W.D. Tex. 1986)). A rehabilitation plan is successful when a debtor's plan is "not likely to be followed by . . . liquidation, or the need for further financial reorganization." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting 11 U.S.C. § 1129(a)(11)). The success of a debtor's plan "need not be guaranteed," *In re M & S Assocs., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992), but should have a "reasonable assurance of commercial viability." *Save Our Springs*, 632 F.3d at 172 (citing *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993)); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *In re Arts Dairy, LLC*, 432 B.R. 712, 716–17 (Bankr. N.D. Ohio 2010) ("Debtors emerging from

---

[3] The following discussion of feasibility reiterates the Court's discussion of feasibility in *In re Geijsel*, 480 B.R. 238, 256–61 (Bankr. N.D. Tex. 2012).

a Chapter 11 case are, by definition, attempting to overcome difficult financial circumstances.").
Courts should closely scrutinize plans that are more "visionary" than they are realistic, pragmatic
approaches to the debtor's financial problems. *See, e.g., In re Trenton Ridge Investors, LLC*, 461
B.R. 440, 479 (Bankr. S.D. Ohio 2011). Still, a plan may be approved despite having a
"marginal prospect of success" if the secured creditor is fully protected in the event of the plan's
failure. *See Briscoe Enters.*, 994 F.2d at 1166. A feasible plan does not, however, "shelter the
Debtors from the inevitable." *Anderson Oaks*, 77 B.R. at 111. Courts should consider
contingencies and risks, but need not dwell on the best and worst contingencies. *See T-H New
Orleans*, 116 F.3d at 802 ("Debtors are not required to view business and economic prospects in
the worst possible light.").

Courts have employed the following factors in determining whether a plan is feasible: the
debtor's capital structure, the earning power of the business, economic conditions, the ability of
debtor's management, the probability of continuation of management, and any other related
matter. *See, e.g., In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 611 n.8 (Bankr. W.D.
Tex. 1990). This is a loose test; a court can weigh (or indeed ignore) various factors at its
discretion. *See, e.g., In re Landing Assocs., Ltd.*, 157 B.R. 791, 819 (Bankr. W.D. Tex. 1993).
The factors, not surprisingly, bunch together and are easily confused and conflated with each
other. Courts do not typically "check off" factors and need not consider all the factors in their
decisions. *See In re Am. Solar King Corp.*, 90 B.R. 808, 832–33 (Bankr. W.D. Tex. 1988)
(finding courts do not need to "check off" factors); *see also Save Our Springs*, 632 F.3d at 173
(noting court did not need to analyze each of the six factors in finding the plan infeasible).

The debtor's capital structure

Courts, understandably, look favorably on debtors with available capital. Though courts
do not need to assume the worst, they should be wary of a plan in which "virtually all of

the income" goes to paying off the plan without a "sufficient buffer"[4] to weather economic storms. *Compare M & S Assocs.*, 138 B.R. at 851 (citing *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989) ("When virtually all of the income generated from the property 'is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code.'")), *with In re Adamson Co., Inc.*, 42 B.R. 169, 176 (Bankr. E.D. Va. 1984) ("[Debtors'] cash, while currently being used to reduce interest expense, is available to the debtors and provides a fund by which the administrative expenses of the bankruptcy proceedings may be paid as well as serving as a sufficient buffer for any transitional cash requirements that the debtors may have in commencing operations under a confirmed plan."). This is especially true when the debtor needs to literally weather the weather and/or is in a volatile industry like the dairy business. *Compare In re Holthoff*, 58 B.R. 216, 220–21 (Bankr. E.D. Ark. 1985) ("The debtors have accumulated a huge debt far beyond their ability to pay even assuming fortuitous weather and a substantial increase in commodity prices in the future."), *with In re Martin*, 66 B.R. 921, 928 (Bankr. D. Mont. 1986) ("Thus, [a government agricultural insurance program for a dairy debtor] will provide stability of income in the future against abnormal weather and catastrophic conditions."); *In re Wiersma*, 324 B.R. 92, 114 (B.A.P. 9th Cir. 2005) ("There was also no evidence to show that [the debtor] could weather a period of underachievement or any large-scale problems with the new dairy, new employees, or new cows.").

The earnings power of the business

A court should consider "concrete" and not "speculative" projections of a business. *See M & S Assocs.*, 138 B.R. at 849 (citing *In re Sound Radio, Inc.*, 103 B.R. 521, 524 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990) ("Income projections offered in support of reorganization

---

[4] *In re Adamson Co., Inc.*, 42 B.R. 169, 176 (Bankr. E.D. Va. 1984).

plans 'must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic.'")). Still, as the court will be considering projections, some degree of speculation is involved. So, it is an overstatement to say that a debtor cannot speculate, but any speculation must be grounded in "financial realit[y]." *M & S Assocs.*, 138 B.R. at 851.

One way to assess the reliability and soundness of a debtor's projections is to use the period of the case as a test-run, and to see if the debtor has, indeed, been able to meet its projections. *See T-H New Orleans*, 116 F.3d at 802 (finding that debtors meeting projections during case was sign of feasibility). If so, it alleviates much of the court's concerns. *See In re Monnier Bros.*, 755 F.2d 1336, 1341–42 (8th Cir. 1985) (noting it was a good sign of feasibility that debtors had been operating "within the bounds" of their projections; *see also In re Wolf*, 61 B.R. 1010, 1012 (Bankr. N.D. Iowa 1986) ("The feasibility of the debtor's projections is also corroborated by the debtor's performance during the proceedings in this court."). If debtors have not been meeting their projections, they need a legitimate, fixable excuse. *See In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 430 (Bankr. W.D. Mo. 2009) ("Debtor may not have met its projections for the first three months, during one of the worst recessions this country has seen since the Great Depression, but it has shown progress in its second quarter."). Still, courts should be wary of debtors manipulating their projections by presenting a "moving target," that is, adjusting their projections or morphing them in a way that suggests gamesmanship. *See In re Nw. Timberline Enters., Inc.*, 348 B.R. 412, 426–27 (Bankr. N.D. Tex. 2006) (noting debtors' projections were amorphous and were difficult to tie to financial statements). *But see In re Way Apartments, D.T.*, 201 B.R. 444, 453 (N.D. Tex. 1996) (The debtor modified its plan to pay creditors from a two-year period to a seven-year period and the plan was confirmed.). Courts can also weigh a debtor's ability to make adequate protection payments during the case, especially if the adequate protection amount is close to what debtors would pay under the plan.

*See In re Bastankhah*, No. 10-40058, 2012 Bankr. LEXIS 256, at *5 (Bankr. S.D. Tex. Jan. 18, 2012) ("The Court further notes that the Debtors have been timely making adequate protection payments to Banco during the case in an amount that is close to the proposed monthly payment amount under the Plan.").

A court should determine if the debtor is on the path to recovery by doing better during the case than they were prior to filing bankruptcy. *See In re Haukos Farms, Inc.*, 68 B.R. 428, 436 (Bankr. D. Minn. 1986) ("Accordingly, it appears that even accepting the Debtor's value and debt figures, the Debtor is in a worse financial position currently than it was at filing. It is highly unlikely that the Debtor's operation has the present, inherent capability of funding a 100 percent plan or that it could reasonably expect to have that capability in the foreseeable future."). If a debtor remains stagnant but projects a substantial improvement in its numbers, then the debtor needs to convince the court in a substantive, detailed way why the future will be different. *See In re Bryant*, 439 B.R. 724, 738–39 (Bankr. E.D. Ark. 2010) (finding the debtor's explanation for higher revenues in the future was reasonable and convincing).

Economic conditions and ability of management

Courts should ascertain the "root cause" of the filing and determine (1) whether it was the debtor's fault, and (2) whether it is gone or likely to be gone soon. *See In re Am. Family Enters.*, 256 B.R. 377, 404–05 (D.N.J. 2000). If it was the debtor's fault, then this is understandably not a good sign. Poor management is not likely to become good management. However, if the bankruptcy is caused by outside contingencies, such as a fragile economy, then the root cause contingency might go away.

Still, for the second step—whether the "root cause" will in fact dissipate—courts may, to some degree, have to predict the debtor's future behavior. Though courts will accept rosy or dire predictions if they are supported by ample facts, courts have understandably been hesitant to get

too creative or bold with predicting uncertain markets, especially, for example, the milk market.

*Compare Landing Assocs.*, 157 B.R. at 819 (finding optimistic predictions for occupancy rate of apartment building was sound where apartment building was only apartment building near a large military base), *with In re Yett*, No. 02-03054, 2003 Bankr. LEXIS 2250, at *20–22 (Bankr. D. Idaho Apr. 2, 2003) ("The problem, of course, is using a temporal snapshot [of the time of the case] to evaluate the overall feasibility of the Plan. Historical milk prices, as represented . . . , cover quite a range. . . . It is certainly possible that milk prices will not improve or, if they do, may suffer at some point a downward trend rendering Debtors unable to make the payments called for by the Plan.").[5]  It is, therefore, not standard to accept a plan that assumes a dramatic swing in prices or market conditions.  *See Haukos Farms*, 68 B.R. at 437 ("A Bankruptcy Court cannot order the price of grain to rise; nor can it enjoin against further decline in the value of farm land.  Not surprisingly, where the plight of a debtor is largely the result of a hostile economy, appropriate effective judicial remedy in Chapter 11 to the debtor's condition is often severely limited; and in many cases, is entirely unavailable.").  The exception to this rule is if the court determines that the financial conditions will improve simply due to odds against, say, a 100-year recession reoccurring.  *See Am. Trailer & Storage*, 419 B.R. at 430 (noting that "worst recession[] this country has seen since the Great Depression" would not continue to affect debtor's trailer business in the upcoming years to the point it did that led to the filing); *see also In re Retzlaff*, 64 B.R. 137, 138–40 (Bankr. N.D. Iowa 1986) (finding that adverse weather conditions which led to debtor's filing were not likely to continue).

---

[5] In this passage, the court was addressing creditors' arguments that milk prices, which were down during the pendency of the case, rendering debtor unable to meet its projections, would stay down.  Despite the court's open acceptance of the basic randomness of milk prices, the court approved the plan because the creditor had sufficient remedies in the event of the debtor not being able to meet its payments.

<u>Other related matters</u>

This category is a catch-all and can hypothetically encompass any number of circumstances that may arise in a particular case. Courts have considered factors such as the blessing or lack of blessing by the U.S. Trustee,[6] or whether there is negative amortization in the plan.[7]

An oft-repeated concern (already somewhat addressed in the above discussion concerning the importance of the debtor's capital structure) is how much of a "cushion" the debtor has. *See M & S Assocs.*, 138 B.R. at 849 ("The availability of credit, both capital and trade, the adequacy of funds for equipment replacement, and provisions for adequate working capital are other factors which should be examined [in a feasibility analysis]."). The desire for a "cushion" is driven by the desire to protect creditors from entering into a non-consensual risky relationship with a bankrupt debtor who is promising to do better a second time around. This is especially pertinent when the plan contemplates large balloon payments.

Some courts, in addressing balloon payments, have taken the position that balloon payments are themselves feasible only if the court is satisfied that there will be either: (1) a successful sale to a likely or known buyer, or (2) the ability of the debtor to obtain refinancing from a likely or known refinancier. *See In re Briscoe Enters., Ltd., II*, 138 B.R. 795, 805–06 (N.D. Tex. 1992). Additionally, courts consider several factors in assessing the viability of a plan with a major balloon payment. They include future earnings capacity of the debtor, whether the plan provides for payment of principal and interest to the secured creditor, the motivation of the debtor to execute the plan successfully, the equity in the property, and whether the plan

---

[6] *Compare Yett*, 2003 Bankr. LEXIS 2250, at *20–22 (trustee recommended confirmation), *with Northwest Timberline*, 348 B.R. at 429 (court took trustee's silence and antipathy towards the case as suggesting trustee did not recommend confirmation).

[7] A repeat offender for unconfirmed plans. *See M & S Assocs.*, 138 B.R. at 850–51; *In re Gen. Electrodynamics Corp.*, 368 B.R. 543 (Bankr. N.D. Tex. 2007).

provides for the reduction of debt to enhance the prospect of refinancing at the end of the plan. *See, e.g., Bastankhah*, 2012 Bankr. LEXIS 256, at *6–7.

Courts are concerned with using performance measures to determine whether a debtor can meet its monthly payments in a way that essentially apes the standard feasibility analysis, up until the time of the balloon payment, so that the proposed balloon payment will, indeed, be what the plan contemplates and not more. Then, a court should consider the most important question: whether the creditor's security, in some form, will outweigh its owed, proposed debt at the time of the balloon payment. *See Briscoe Enters.*, 994 F.2d at 1169.[8] Specifically, the court should consider whether the debtor will have sufficient equity to attract a refinancier or, if not, whether the debtor can sell the property and fully pay-off the secured creditor. *See T-H New Orleans*, 116 F.3d at 802[9] ("The Plan included several alternatives which could reasonably result in the full payment of FSA's claim; for example, by refinancing, a balloon payment at the end of twenty-four months, [or] the sale of the Hotel to a third party . . . ."); *see also Trenton Ridge*, 461 B.R. at 494 (quoting *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 316 (B.A.P. 10th Cir. 2006) ("[T]he court does need some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded.")).

---

[8] The court in *Briscoe Enterprises* stated as follows:

> Heartland [the creditor] and the district court suggest that allowing a balloon payment is unacceptable as there is no immediate indication from where the funds will come to pay off the balloon. . . . It is reasonable to assume that the property itself will provide the source for the balloon payment. There is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold which will provide the balloon or refinancing will be possible.

*Briscoe Enters.*, 994 F.2d at 1169.

[9] However, a liquidation can be acceptable if it is represented and contemplated in the plan as such. *See T-H New Orleans*, 116 F.3d at 802.

**D.**

Friendship Dairies has struggled mightily during the pendency of this chapter 11 case. It has generally failed to meet projections and, as was learned at confirmation, it defaulted on its regular $83,000 adequate protection payments to Frontier. Friendship Dairies' expert, Dr. Raymond Hunter, prepared his analysis of the operations going forward as reorganized under a more intensive milking/farming operation and opined that Friendship Dairies would generate sufficient revenues to pay all operating expenses with excess funds that can be used for plan payments and reserve accounts. It is important to note, however, that his projections do not incorporate Friendship Dairies' required payments under the Plan.

The problem is that Friendship Dairies stumbles at the starting line. Dr. Hunter's cash flow projections are based on fiscal years that run from May through April, with the first fiscal year ending April 2014. Dr. Hunter projected that by the end of the second quarter of the first fiscal year, the timing of which dovetails with the confirmation hearing (October – November 2013), Friendship Dairies would have available funds of $224,000 to be used for payments to creditors and the funding of reserve accounts.[10] He also included within his projections going forward a built-in cash reserve of $500,000. Such reserve is needed to cover a particular month's operational shortfall and thus avoid a series of potential crises going forward. The Debtor contends that, based on Dr. Hunter's projections, it generates sufficient revenues for each quarter of each fiscal year to make required plan payments and, at the same time, maintain the $500,000 reserve account for short-run shortfalls. The evidence reveals, however, that Friendship Dairies has no reserve account—much less a reserve account generated from operations.

From the Plan, as supplemented by the evidence at the confirmation hearing, the payments due upon the effective date under the Plan include the following:

---

[10] Such sum results after reconciling certain one-time payments made during the bankruptcy.

- $250,000 for attorneys' fees;

- $145,000 for administrative (§ 503(b)(9)) claims;

- $26,000 for a cure claim;

- $106,000 to $130,000 to AgStar;

- $95,000 to Frontier; and

- $24,692 to unsecured creditors.

After the initial round of payments are made, the regular monthly payments run approximately $260,000 to $270,000 per month.

Friendship Dairies does not have available funds to make the payments due upon the effective date of the Plan. Its counsel, in closing argument, alluded to arrangements with the administrative claimants by which they would accept deferred payments for a period of months in lieu of payments to the unsecured creditors. Counsel further argued that the unavoidable delays in resolving claims will allow Friendship Dairies to essentially put-off payments until a time at which its operations will generate sufficient revenues. In effect, Friendship Dairies submits that, with time, it will have funds to make payments and is asking the Court to accept such premise.

Assessing projected cash flows is difficult; with a dairy enterprise, it involves acceptance of assumptions that are fraught with volatility. But a debtor in chapter 11 must provide concrete evidence that it can make the payments called for by the effective date. A debtor's ability to meet its initial round of obligations is strong evidence of its ability to operate under positive projections going forward. Its failure to definitively prove that it can make its first round of payments signals an impending crisis.

Friendship Dairies' operations during the pendency of the case do not signal success going forward. Though it has been relieved for the most part of making payments to AgStar, its

major secured creditor, it has still struggled.  Its failure to make two $83,000 adequate protection payments to Frontier further evidences a problem.  Such default occurred on the eve of the confirmation hearing.

The format of Dr. Hunter's projections is problematic as it inexplicably includes cash flow projections *without plan payments*.  The Court is asked to consider the cash flow analysis as an abstraction.

An impending cash flow crisis is anticipated by the terms of the Plan.  Friendship Dairies has incorporated multiple balloon payments in its proposals to creditors, but has provided no evidence of how the balloon payments will be paid.  It is asking the Court to take yet another leap of faith that such balloons will somehow be satisfied through deferrals or refinancings.  Friendship Dairies has over $45 million in debt with AgStar and Frontier alone.  Lengthy amortizations with balloons will not put Friendship Dairies in a materially better position in the future.  A hope of future financing appears futile.  In light of Friendship Dairies' struggles during the case, its crushing debt load, and lack of capital or cushion of any sort, the Court can only conclude that the Plan will not work.  Failing the feasibility requirement, the Plan cannot be confirmed.  *See* 11 U.S.C. § 1129(a)(b)(1).

Though the Court has determined that the Plan fails the feasibility requirement and thus fails to satisfy the requirements of § 1129(a) of the Bankruptcy Code, it will briefly address the specific treatment of one aspect of AgStar's claim.  As noted above, AgStar's claim has been objected to; the objection goes mostly to the amount of the claim rather than its validity.  It is assumed that AgStar, as an overly secured creditor, may accrue at least some interest and perhaps some attorneys' fees.  As for the fees, the Plan provides that AgStar's allowed fees will be paid fifteen years hence, without interest, and by continuation of the regular Plan payments to AgStar until the fees are paid.  AgStar objects to such treatment as unfair.  Neither Friendship

Dairies nor AgStar specifically addressed the propriety of such treatment under the law.  The Plan capitalizes any allowed interest in arriving at a new claim amount, but does not do the same with allowed fees.  Any allowed fees, therefore, would be paid an amount much less than their present value.  Such treatment fails the fair and equitable requirement of § 1129(b).  This, too, prevents confirmation.

### End of Memorandum Opinion ###